UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
VLADISLAV RUCHINSKY,

          Plaintiff,

-against-

MITCHELL J. DEVACK, YULIYA ANGELOVA,
and RUDOLPH E. GRECO, Jr.,

          Defendants.
----------------------------------------------------------x

**MEMORANDUM AND ORDER**

14-CV-2219 (SLT)

**TOWNES, United States District Judge:**

    Approximately one week after a judgment was entered in divorce proceedings brought by his wife, *pro se* plaintiff Vladislav Ruchinsky commenced this civil action against his former wife, Yuliya Angelova; her attorney, Mitchell J. Devack; and Rudolph E. Greco, Jr., one of the state-court judges who presided over the matrimonial action. Plaintiff's complaint seeks, among other things, an order repealing all of Justice Greco's rulings and imposing treble damages based, in large part, on plaintiff's calculations of the difference between the amount of child support plaintiff actually paid and the amount of child support plaintiff believes he should have been ordered to pay. Plaintiff's request to proceed *in forma pauperis* is granted for the limited purpose of this order but, for the reasons set forth below, this case is dismissed in its entirety.

## BACKGROUND

    The following facts are drawn primarily from plaintiff's 57-page complaint (the "Complaint"), which includes a detailed account of plaintiff's divorce proceedings from the time plaintiff was served with process in July 2011 until judgment was entered on April 1, 2014. The Complaint attaches 38 exhibits, which are indexed on pages 3 through 7 of the Complaint. The following facts do not purport to be an exhaustive account of the matrimonial proceedings.

Rather, this Court includes only such facts as are necessary to an understanding of plaintiff's claims.

Plaintiff and Angelova were married on August 17, 2003 (Complaint, ¶ 3). On November 1, 2007, they had a child, Lev Ruchinsky (*id.*, Ex. 6, p. 3). Approximately three and one-half years later, in April 2011, Angelova filed for divorce in the Supreme Court of the State of New York, Queens County (*id.*, ¶¶ 16, 24). Plaintiff was not served with a summons until July 2011 (*id.*, ¶ 24).

In November 2011, Angelova's counsel—the Law Offices of Mitchell J. Devack, PLLC—moved before Supreme Court Justice Pam Jackman Brown for *pendente lite* relief. That motion requested that Angelova be awarded (1) custody of Lev, (2) temporary child support in the amount of $1,551.00 per month, (3) exclusive possession of the marital residence, and (4) $25,000 in interim counsel fees (*id.*, Ex. 6, pp. 1-2). In support of that motion, Angelova's counsel submitted an affidavit executed by Angelova on November 3, 2011 (the "Angelova Affidavit"), and an eight-page affirmation executed by Devack on November 1, 2011 (the "First Devack Affirmation") (*id.*, Ex. 6, pp. 6-13).

The First Devack Affirmation—which is reproduced in its entirely in Exhibit 6 to the Complaint—repeated some of the allegations contained in the Angelova Affidavit concerning plaintiff's alleged inability to visit Lev during the week, the feasibility of the visitation schedule Angelova proposed, and Angelova's intent to provide "the majority of the non-monetary contributions to the child's wellbeing" (*id.*, Ex. 6, pp. 7-9). The First Devack Affirmation then devoted more than four of its eight pages to the request for interim attorney's fees (*id.*, Ex. 6, pp. 9-13). In support of the fees request, Devack provided information concerning his experience,

2

his billing rate, and his financial arrangements with his client, and argued that an award of attorney's fees was appropriate because plaintiff was unnecessarily prolonging the litigation (*id.*).

Although plaintiff cross-moved, the Complaint does not attach a copy of plaintiff's submissions. However, the Complaint attaches as Exhibit 8 three pages of a 13-page "Affirmation in Reply and in Opposition to Cross-Motion," executed by Devack on January 18, 2012 (the "Second Devack Affirmation"). In that affirmation, Devack alleges that plaintiff's cross-motion sought, among other things, (1) joint custody of Lev, (2) suspension of plaintiff's child support obligations, (3) an order disqualifying Devack from continuing to represent Angelova, and (4) other, unspecified penalties for "perjury" allegedly contained in the First Devack Affirmation (*id.*, Ex. 8, p. 1). Referring to plaintiff's allegations of perjury as "libelous," and accusing plaintiff of "dilatory and obstructionist tactics," the Second Devack Affirmation argued that awarding interim attorney's fees would "send a loud and clear message to Mr. Ruchinsky that his actions have consequences" (*id.*, Ex. 8, p. 2).

After a hearing on January 19, 2012, at which plaintiff stated that he was about to take a 12-week, unpaid medical leave from his job (*id.*, Ex. 9, p. 2), Justice Brown entered an order granting Angelova some of the relief she had requested. That order granted Angelova temporary residential custody of Lev, subject to visitation rights to be agreed upon by the parties; temporary exclusive use and occupancy of the marital residence; and *pendent lite* child support in the amount of $382.50 bi-weekly or $9,945.00 annually, plus 45 percent of any unreimbursed medical and childcare expenses (*id.*, Ex. 10, p. 1). The order did not grant interim attorney's fees, and did not specifically address plaintiff's cross-motion.

3

At a conference on June 13, 2012, Devack renewed his request for interim attorneys fees, accusing plaintiff of filing "lengthy, lengthy papers" and "lengthy letters to the Court," which required Devack to respond at Angelova's expense (*id.*, Ex. 13, p. 2). In response, plaintiff again accused Devack of making "a false statement under oath" and asked Justice Brown to disqualify Devack (*id.*, Ex. 13, pp. 3-4). Justice Brown interrupted plaintiff's arguments, stating that nothing in the record indicated that Devack was "acting in a matter [*sic*] that is inconsistent with his obligation to represent his client ... zealously and legally" (*id.*, Ex. 13, p. 5).

After summarily denying plaintiff's applications, Justice Brown heard plaintiff's argument that he had paid Angelova more in child support than he legally owed (*id.*, Ex. 13, p. 6). However, when Justice Brown asked plaintiff if he had proof of the amounts he had paid, plaintiff stated that he did not have his check register with him (*id.*). Justice Brown responded, "On the next court date you bring that proof and we do a recalculation" (*id.*, Ex. 13, p. 7).

On July 7, 2011, plaintiff sent an e-mail to the Queens County District Attorney's Office entitled, "Judge attempts to conceal attorney's perjury in New York State Supreme Court" (*id.*, Ex. 27). In that e-mail, plaintiff alleged that Devack "committed written perjury" during the divorce proceedings, and "allowed an obviously false statement" to remain in Angelova's affidavit of November 7, 2011, but that Justice Brown had not disqualified Devack (*id.*). Plaintiff requested that the District Attorney's Office "intervene in order to have Mr. Devack removed from the case ... [and] to have a different judge assigned ..." (*id.*).

Although plaintiff's e-mail did not request that Devack and Justice Brown be prosecuted, plaintiff subsequently "tried to report ... Devack's perjury in two police precincts ... so as to start a criminal complaint ..." (*id.*, ¶ 63). After the first of the two precincts refused to pursue the case,

4

plaintiff "reported the matter to [the] New York State Inspector General ..." (*id.*, ¶ 64). The Inspector General also refused to take action, informing plaintiff that they did not deal with such issues (*id.*).

On July 11, 2012, plaintiff wrote a letter to Jeremy S. Weinstein, the Administrative Judge for the Civil Term of the Supreme Court of the State of New York's Eleventh Judicial District, requesting that Devack be disqualified from representing Angelova and that his case be re-assigned to another judge (*id.*, ¶ 62). By letter dated July 17, 2012, the Administrative Judge informed plaintiff that he could not interfere in decisions made by other judges, and suggested that plaintiff ask Justice Brown to recuse herself (*id.*, Ex. 26). Plaintiff's Complaint does not indicate whether plaintiff ever moved for recusal.

Plaintiff did, however, comply with Justice Brown's directive to bring proof of his overpayments of child support to his next court appearance (*id.*, ¶ 40). At the July 25, 2012, conference, in the middle of a discussion regarding the parties' parenting plan, plaintiff told Justice Brown that he "accounted for the November 2011 through January 2012 child support ... [and] brought that accounting here with the checks and pay stubs ...." (*id.*, Ex. 14, p. 3). Plaintiff alleged that this documentation showed that he "overpaid" his child support, but did not request a specific action and immediately resumed discussing the parenting plan (*id.*). Justice Brown never addressed plaintiff's allegation that he had overpaid his child support (*id.*, ¶ 40).

On August 7, 2012, Justice Brown retroactively revised plaintiff's child support obligations in accordance with the Child Support Standard Act (the "CSSA"), N.Y. Dom. Rel. Law § 240(1-b). Applying the detailed formula set forth in that statute, Justice Brown calculated that plaintiff owed child support payments of $1,135.61 per month, or $13,627.41 annually

5

(Complaint, Ex. 15, p. 2). In addition, Justice Brown calculated that plaintiff owed Angelova $4,895.34 for the period between November 9, 2011, and August 31, 2012—*i.e.*, $11,015.34 minus the 16 bi-weekly payments of $382.50 for the period between January 19, 2012, and August 31, 2012 (*id.*, p. 3).

Justice Brown's August 7, 2012, order specified that plaintiff was to make his child support payments on the first of each month to the Child Support Collections Unit in Queens, New York (the "CSCU"), "commencing September 1, 2012," and that the $4,895.34 was to be paid within 60 days of the date of the order (Complaint, Ex. 15, p. 3). Justice Brown did not specify the manner in which the $4,895.34 was to be paid, but issued an income deduction order pursuant to section 240(2)(b)(2) of the Domestic Relations Law, which directed plaintiff's employer to withhold the child support payments from plaintiff's paycheck.

On August 26, 2012, after becoming "concerned about the absence of any messages" from the CSCU, plaintiff e-mailed Devack for advice (Complaint, ¶ 45). In his response, Devack warned plaintiff that he was representing Angelova, not plaintiff, and that plaintiff should perform his own independent research (*id.*, Ex. 16, p. 1). However, Devack provided plaintiff with his understanding of the judge's order, advising plaintiff to pay the $4,895.34 directly to Angelova (*id.*). Plaintiff followed Devack's advice (*id.*, ¶ 45). However, in implementing the income deduction order, the CSCU directed plaintiff's employer to withhold an additional $567.80 per month to pay off the $4,895.34 (*id.*, ¶ 47).

On September 5, 2012, plaintiff served Angelova with a "Motion to Reargue/Renew Petition," which was returnable on October 10, 2012, before Justice Brown (*id.*, ¶ 81, and Ex. 32, pp. 4-7). In late September 2012, the case was re-assigned to Justice Greco (*id.*, ¶ 83, and Ex.

6

33). Plaintiff believed that this re-assignment necessitated amending his motion to reflect "the change of the presiding judge and to choose a new hearing date" (*id.*, ¶ 83). Since "the deadline for making the motion had already passed," plaintiff elected "to make a new motion"—a "Motion for Pendente Lite Relief" dated November 1, 2012 (*id.*).

That motion requested, among other things, that plaintiff's child support payments be reduced to $7,745.20 annually, retroactive to November 9, 2011, and that plaintiff be credited with all of the child support payments which he had actually made since November 9, 2011 (*id.*, Ex. 19, p. 1). Prior to the start of trial on December 18, 2012, defendant Rudolph Greco—the Supreme Court Justice to whom the case had been reassigned—acknowledged that plaintiff's motion was pending, and stated: "That motion will be incorporated into the final decision. We will dispose of that one way or another in the final judgment" (*id.*, Ex. 22, p. 3).

On January 4, 2013, after a trial that focused primarily on the issue of custody, Justice Greco issued a "Decision/Order After Trial" which awarded Angelova sole legal custody of Lev (*id.*, Ex. 29, p. 3). The judge denied both parties' motions for attorney's fees and sanctions, and denied plaintiff's request for a downward modification of his child support obligations, finding that plaintiff had not met "his burden of demonstrating a 'substantial change in circumstances'" (*id.*). Justice Greco did not rule on "that portion of [plaintiff's] motion addressing arrears," noting that the parties had agreed to have the issue decided upon further submissions (*id.*).

On February 4, 2013, Lev was diagnosed with diabetes after plaintiff, recognizing "obvious signs" of the disease, took him to an emergency room (*id.*, ¶ 71). Two days later, plaintiff, believing that Lev was receiving "bad care in the custody of ... Angelova" (*id.*), filed a "Post Trial Memorandum," portions of which are attached to the Complaint as Exhibit 30. That submission principally requested that Justice Greco revise his custody decision, but also

7

addressed child support and the question of whether plaintiff had overpaid his obligations. In response, Angelova apparently argued that plaintiff was in arrears on his child support payments, and sought an upward modification of plaintiff's childcare obligations.

In a "Further Decision/Order After Trial" dated March 21, 2013, Justice Greco addressed only the question that was left open in his prior Decision/Order—namely, the issue of child support arrears. Justice Greco interpreted plaintiff's overpayment argument as faulting Justice Brown's calculation of plaintiff's annual income for failing to take into consideration plaintiff's unpaid medical leave (*id.*, Ex. 31, p. 1-2). Noting that the law permitted Justice Brown to consider plaintiff's earning potential, not just his actual income, the judge opined that defendant's reduced income in the first 12 weeks of 2012 was "of little or no consequence in rendering a decision ..." (*id.*, Ex. 31, p. 2). Justice Greco further asserted that plaintiff had not sought reconsideration of, or appealed, Justice Brown's August 7, 2012, ruling (*id.*).

The judge declined to address issues relating to modification of child support, child custody and parenting time, noting that his prior Decision/Order addressed these issues and that those decisions were "not subject to review" (*id.*, Ex. 31, p. 1, 3). However, Justice Greco amended that portion of his prior Decision/Order which stated that plaintiff's annual income was $62,000.00, since both parties had submitted evidence that the correct figure was $85,000.08 (*id.*, Ex. 31, p. 3). The judge did not recalculate plaintiff's child support obligation, but directed the parties to settle a judgment in accordance with his decisions (*id.*).

According to a letter from Devack dated November 22, 2013, which is attached to the Complaint as Exhibit 35, Angelova "noticed the Judgment of Divorce for settlement on April 8, 2013." Plaintiff apparently misconstrued that submission, which was dated March 25, 2013, as a "Notice of Settlement" rather than a proposed judgment (*id.*, ¶ 89). Accordingly, when plaintiff

received a telephone call from the United States Department of State in April 2013, alerting plaintiff that Angelova had applied for a passport for Lev (*id.*, ¶ 101), plaintiff believed that the passport application was filed only to give Angelova more leverage in settlement negotiations (*id.*, ¶ 107). Plaintiff also believed that a "hastily planned" Caribbean vacation which Angelova took with Lev in 2014 was merely "an attempt to justify ... Angelova's request for [a] passport for Lev ..." (*id.*, ¶ 106; brackets added).

Plaintiff never filed a counter proposed judgment. Rather, on May 8, 2013, well before judgment was finally entered in the matrimonial action, plaintiff filed a Notice of Appeal with the Appellate Division of the Supreme Court of the State of New York (*id.*, ¶74). About a month later, plaintiff filed an "emergency motion ... to stay post-trial award of custody" (*id.*). On June 17, 2013, the Appellate Division, Second Department, dismissed this interlocutory appeal, noting that "no appeal lies from a decision," and denied the motion as "academic" (*id.*, ¶ 75).

On November 22, 2013, Devack wrote a letter to Justice Greco, stating that plaintiff had not filed a "counter proposed Judgment" and requesting that Angelova's proposed judgment be entered (*id.*, Ex. 35). According to the Complaint, judgment was ultimately entered on April 1, 2014, and Devack served plaintiff with a notice of entry on April 2, 2014 (*id.*, ¶ 140). It is unclear whether plaintiff has sought to appeal the judgment.

**The Complaint**

On April 7, 2014, less than a week after receiving the notice of entry of judgment, plaintiff commenced this action. Plaintiff's Complaint contains three causes of action, each of which alleges one or more violations of a specific criminal statute. The first cause of action alleges that defendants Devack and Greco both committed perjury in violation of 18 U.S.C.

9

§ 1621 (Complaint, ¶¶ 144-49). The allegations regarding Devack relate to the First Devack Affirmation, which Devack filed in November 2011 in connection with Angelova's motion for *pendente lite* relief (*id.*, ¶ 145). The allegations regarding Justice Greco relate to statements contained in the "Further Decision/Order After Trial" dated March 21, 2013, in which Justice Greco asserted that plaintiff had not sought reconsideration of Justice Brown's August 7, 2012, ruling (*id.*, ¶ 146).

The second cause of action alleges that defendants Devack and Angelova violated the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO"), by "forming an association for the sake of engaging in [a] ... pattern of racketeering activity" (Complaint, ¶ 160; brackets and ellipses added). Plaintiff alleges that this association, "which satisfies the definition of 'enterprise' under 18 U.S.C. § 1961(4)" (Complaint, ¶155), "committed four (4) instances [of] extortion, under color of official right, against [plaintiff]" (*id.*, ¶ 154; brackets added) and filed a "fraudulent passport application" (*id.*, ¶ 153). The body of plaintiff's Complaint specifically describes three of the four alleged instances of extortion. First, plaintiff characterizes Angelova's November 2011 motion for *pendente lite* relief, through which Angelova and Devack obtained "an order for child support from a parent who already paid equivalent amount of child support voluntarily and who faced an impending interruption of income for health reasons" as the "<u>first</u> successful instance of extortion ..." (*id.*, ¶ 37) (emphasis in original). Second, plaintiff labels defendants' successful application to increase plaintiff's support payments to $1,135.61 per month as "[t]he <u>second</u> successful instance of extortion ..." (*id.*, ¶ 42) (emphasis in original). Third, plaintiff characterizes Devack's demand that plaintiff pay the $4,895.34 in arrears directly to Angelova as the "[t]he <u>third</u> successful instance of extortion ..." (*id.*, ¶ 45) (emphasis in original).

The third cause of action alleges that defendants Angelova and Devack interfered with commerce by threats and violence in violation of 18 U.S.C. § 1951. Plaintiff alleges that these defendants "chose to summon [plaintiff] to court, as opposed to trying to negotiate a settlement" shortly after plaintiff began working for Knoa Software, Inc. (Complaint, ¶ 167; brackets added). Because of the litigation—which plaintiff characterizes as use of "the New York State Unified Court System and other government agencies to harass, threaten, and extort money from [plaintiff]" (*id.*; brackets added)—plaintiff "was prevented from spending more time and effort on his projects at work ..." (*id.*, ¶ 169). As a result, plaintiff "could not complete some of his projects at work," which harmed Knoa by interfering with the development of its software (*id.*).

Plaintiff's Complaint seeks three types of remedies. First, plaintiff seeks money damages, plus reasonable attorney's fees. In determining the amount of damages, plaintiff first calculates the amounts he would have paid in child support if Justices Brown and Greco had ruled in his favor. For example, plaintiff asserts that Justice Brown improperly raised his annual child support payments to $13,627.41, but that the payments warranted by his actual income should have been only $9,130.89 annually (Complaint, ¶¶ 173, 175). Plaintiff then includes the various overpayments which he allegedly made, including the $4.895.34 which he allegedly paid twice. Using this methodology, plaintiff estimates that the amount of money "extorted" from him totaled $20,762.08, then asserts that he is entitled to treble this amount as damages under 18 U.S.C. § 1964(c) (Complaint, ¶ 179). Plaintiff also asserts that he is entitled to "three (3) times the monetary equivalent of reasonable attorneys' fees, if any attorneys will be involved in litigating this complaint" (*id*, ¶ 185).

Second, plaintiff seeks injunctive relief. Specifically, plaintiff seeks an order (1) repealing all of the rulings issued by Justice Greco in plaintiff's matrimonial action, (2)

11

prohibiting Justice Greco from continuing to preside over that action or issuing any further rulings in the case, and (3) prohibiting Devack from continuing to represent Angelova (*id.*, ¶¶ 186-88). Third, plaintiff requests "imposition of penalties against the defendants to the full extent prescribed by laws cited in [the three causes of action] ..." (*id.*, ¶ 189; brackets added).

## DISCUSSION

### A. Standard of Review

Title 28, Section 1915(e)(2)(B), of the United States Code requires a district court to dismiss a case if the court determines that the complaint "is frivolous or malicious; fails to state a claim on which relief may be granted; or seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). To state a claim, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In evaluating whether a pleading states a claim for relief, "'a court must accept as true all [factual] allegations contained in a complaint' but need not accept 'legal conclusions.'" *Halebian v. Berv*, 590 F.3d 195, 203 (2d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Moreover, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," and to nudge a plaintiff's claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 555, 570.

12

*Pro se* complaints, like other pleadings, must contain sufficient factual allegations to meet the plausibility standard. *See Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009). However, "[a] document filed *pro se* is 'to be liberally construed,' . . . and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). Thus, a court must read a *pro se* complaint with "special solicitude," *Ruotolo v. I.R.S.*, 28 F.3d 6, 8 (2d Cir. 1994), and must interpret it to raise the strongest claims it suggests. *See Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474-75 (2d Cir. 2006).

A plaintiff seeking to bring a lawsuit in federal court must establish that the court has subject matter jurisdiction over the action. *See, e.g., Rene v. Citibank NA*, 32 F. Supp. 2d 539, 541-42 (E.D.N.Y. 1999). "[F]ailure of subject matter jurisdiction is not waivable and may be raised at any time by a party or by the court *sua sponte*. If subject matter jurisdiction is lacking, the action must be dismissed." *Lyndonville Sav. Bank & Trust Co. v. Lussier*, 211 F.3d 697, 700-01 (2d Cir. 2000) (citations omitted); *see* Fed. R. Civ. P. 12(h)(3).

## B. Injunctive Relief

As a preliminary matter, this Court notes that the *Rooker-Feldman* doctrine precludes the Court from granting the injunctive relief that plaintiff seeks. The *Rooker-Feldman* doctrine provides that, in most circumstances, the lower federal courts do not have subject-matter jurisdiction to review the judgments of state courts. *See D.C. Court of Appeals v. Feldman*, 460 U.S. 462, 482-83 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 414-16 (1923). This doctrine "is confined to cases ... brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus.*

*Corp.*, 544 U.S. 280, 284 (2005). The doctrine "does not otherwise override or supplant preclusion doctrine or augment the circumscribed doctrines that allow federal courts to stay or dismiss proceedings in deference to state-court actions." *Id.*

In this case, plaintiff seeks, among other things, an order "repeal[ing] ... all of [the] rulings issued by [Justice] Greco ... in [plaintiff's] action for divorce." Complaint, ¶ 187 (brackets added). Since Justice Greco had already entered judgment in that matrimonial action before plaintiff commenced this case, plaintiff is tacitly requesting that this Court review and reject that judgment, with which plaintiff is clearly dissatisfied. However, under the *Rooker-Feldman* doctrine, this Court lacks jurisdiction to grant this relief. Moreover, since judgment has already been entered by Justice Greco, and since plaintiff does not allege that he filed a notice of appeal following receipt of the notice of entry of that judgment, plaintiff's requests to enjoin Justice Greco and Devack from further involvement in this action are moot.

## C. Monetary Relief

This Court is also precluded from granting the monetary relief plaintiff seeks by both the *Rooker-Feldman* doctrine and the domestic relations exception to federal jurisdiction. "Federal courts have long abstained from exercising jurisdiction over matters involving divorce or alimony." *Sykes v. Bank of America*, 723 F.3d 399, 404 (2d Cir. 2013) (citing *Ankenbrandt v. Richards*, 504 U.S. 689, 693 (1992)). However, "the scope of this matrimonial exception to federal jurisdiction is 'rather narrowly confined.'" *American Airlines, Inc. v. Block*, 905 F.2d 12, 14 (2d Cir. 1990) (quoting *Phillips, Nizer, Benjamin, Krim & Ballon v. Rosenstiel*, 490 F.2d 509, 514 (2d Cir. 1973)). The Supreme Court has held that it only "divests the federal courts of power to issue divorce, alimony, and child custody decrees." *Ankenbrandt*, 504 U.S. at 703. While *Ankenbrandt* did not expressly state that the domestic relations exception extends to child

14

support decrees, the Second Circuit has stated that "'where a federal court is asked to grant a divorce or annulment, determine support payments, or award custody of a child' ... [courts] generally decline jurisdiction pursuant to the matrimonial exception." *Block*, 905 F.2d at 14 (quoting *Csibi v. Fustos*, 670 F.2d 134, 137 (9th Cir. 1982)) (brackets and ellipses added); *see also Donohue v. Pataki*, 28 Fed. Appx. 59, 60 (2d Cir. 2002) (summary order) (district courts lack jurisdiction to invalidate or otherwise review state court decisions relating to child support payments).

"The domestic relations exception will rarely apply to claims solely seeking monetary relief." *Keane v. Keane*, No. 08 Civ. 10375 (GAY), 2012 WL 6582380, at *1 (S.D.N.Y. Dec. 17, 2012), *aff'd*, 549 Fed.Appx. 54 (2d Cir. 2014). However, in an unpublished opinion, the Second Circuit has held that the domestic relations exception may apply to claims for money damages which "begin and end in a domestic dispute." *Schottel v. Kutyba*, No. 06-1577-cv, 2009 WL 230106, at *1 (2d Cir. Feb. 2, 2009) (summary order). In *Schottel*, the plaintiff alleged fraud and coercion in divorce proceedings that deprived her of custody and visitation rights. Although the plaintiff's amended complaint sought only monetary damages, the Second Circuit construed the tort claims as, "at heart, a dispute surrounding the custody of [the plaintiff's] child." *Id.* (brackets added). Reasoning that "a plaintiff cannot obtain federal jurisdiction merely by rewriting a domestic dispute as a tort claim for monetary damages," *id.*, the Second Circuit upheld the district court's decision to dismiss Schottel's fraud claims.

In this case, plaintiff's Complaint tacitly seeks modification of plaintiff's child support obligations by seeking "damages" which are calculated to reverse all of the state court's child support decisions to the extent that they were adverse to plaintiff. Plaintiff merely characterizes all of these adverse decisions as "extortion," then calculates the "damages" attributable to the

15

alleged extortion by taking the amount of child support plaintiff actually paid and deducting the amount of child support that plaintiff would have paid had all of his arguments before the State Court been successful. The "damages" figure also includes the amounts of child support which, plaintiff unsuccessfully argued, he overpaid.

Plaintiff cannot avoid operation of the domestic relations exception by re-casting his challenge to the state court's child support decisions as a Civil RICO claim. Moreover, permitting plaintiff to obtain federal court review of these decisions, which had been incorporated into a judgment before this action began, would also violate the *Rooker-Feldman* doctrine. Under these circumstances, the Court cannot grant plaintiff's claims for monetary relief.

## D. Criminal Penalties

This Court also cannot grant plaintiff's request for "imposition of penalties against the defendants to the full extent prescribed by the laws cited" in plaintiff's three causes of action. Complaint, ¶ 189. "[A] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973). Accordingly, "[a] private citizen does not have a constitutional right to ... compel the initiation of criminal proceedings." *Lis v. Leahy*, No. CIV-90-834E, 1991 WL 99060 at *1 (W.D.N.Y. June 3, 1991). Rather, "criminal prosecutions are within the exclusive province of the public prosecutor, who has complete discretion over the decision to initiate, continue or cease prosecution." *Solomon v. H.P. Action Ctr., H.P.D.*, No. 99 Civ. 10352 (JSR), 1999 WL 1051092, at *1 (S.D.N.Y. Nov. 19, 1999).

In this case, plaintiff has already attempted to file criminal complaints relating to the perjury alleged in Count One of the Complaint. *See* Complaint, ¶ 63. These efforts proved unsuccessful, since both Greco and Devack enjoy immunity with respect to their actions. First,

16

judicial officers enjoy absolute immunity from suits arising out of judicial acts performed in their judicial capacities. *Mireles v. Waco*, 502 U.S. 9, 11 (1991). The absolute judicial immunity of the court and its members "is not overcome by allegations of bad faith or malice," nor can a judge "be deprived of immunity because the action he took was in error ... or was in excess of his authority." *Mireles*, 502 U.S. at 11, 13 (quotations and citations omitted). This immunity may be overcome only if the court is alleged to have taken nonjudicial actions or if the judicial actions taken were "in the complete absence of all jurisdiction." *Id.* at 11-12.

Second, plaintiff's perjury claim against Devack is barred by the litigation privilege. Statements made by parties and their attorneys in the context of a legal proceeding in New York State courts are "absolutely privileged if, by any view or under any circumstances, they are pertinent to the litigation." *O'Brien v. Alexander*, 898 F.Supp. 162, 171 (S.D.N.Y. 1995) (internal quotation marks and citations omitted). This "absolute privilege embraces anything that may possibly or plausibly be relevant or pertinent, with the barest rationality, divorced from any palpable or pragmatic degree of probability." *Baiul v. NBCUniversal Media, LLC*, Nos. 13 Civ. 2205 (KBF), 13 Civ. 2208 (KBF), 2014 WL 1651943, at *17 (S.D.N.Y. Apr. 24, 2014) (quoting *Grasso v. Mathew*, 564 N.Y.S.2d 576, 578 (N.Y. App. Div. 1991)).

Plaintiff himself characterizes the allegedly perjured statements contained in the First Devack Affirmation as "misleading the court on the issue of residential and legal custody of Lev" (Complaint, ¶ 145). Custody was one of the issues contested in Angelova's motion for *pendente lite* relief. Since the allegedly perjured statements were relevant to the litigation, they are covered by the litigation privilege.

The Complaint does not indicate whether plaintiff ever sought to convince a prosecutor to prosecute the defendants under RICO or 18 U.S.C. § 1951. However, the facts alleged by

plaintiff in his Complaint do not suggest extortion, much less a RICO violation. Rather, the facts make out a garden-variety matrimonial litigation in which Devack zealously represented the interests of his client, Angelova. That litigation resulted in court orders which were, in part, adverse to plaintiff. Although plaintiff was compelled by law to follow those orders, that fact did not render any of the litigants' actions, or the court's orders, "extortionate."

Plaintiff's belief that something untoward occurred in this case appears to be based largely on his lack of familiarity with matrimonial proceedings. First, Angelova was legally entitled to seek *pendente lite* relief, regardless of whether plaintiff was voluntarily paying child support. While Justice Brown granted Angelova some of the relief she sought, the judge's ruling was actually quite favorable to plaintiff, granting Angelova only about half of the $1,551.00 per month in child care which Angelova requested and denying Angelova's request for $25,000 in interim counsel fees.

After the parties submitted the facts necessary to calculate child support pursuant to the CSSA, Justice Brown recalculated plaintiff's child support obligations in accordance with the statutory formula set forth in section 240 of New York's Domestic Relations Law. That formula specifies precisely what constitutes "income" for purposes of the statute. Where the combined parental income exceeds $130,000.00—which Justice Brown inaccurately termed "the statutory cap"—the statute prescribes other factors to consider in determining whether to order that child support be paid from income in excess of $130,000.00. Plaintiff does not allege any facts to suggest that Justice Brown applied the statutory formula improperly, but merely speculates that the "large deceitful increase" in his child support payments to $1,135.61—which was still well less than what plaintiff requested—was somehow improper.

After increasing plaintiff's child support obligation, Justice Brown calculated that plaintiff owed $4,895.34 in arrears. Justice Brown's order did not specify how the $4,895.34 in arrears was to be paid. For reasons which are unclear, plaintiff elected to contact Devack who, after warning plaintiff to perform his own independent research, advised plaintiff to pay the $4,895.34 directly to Angelova. Plaintiff was not obligated to follow that advice, but elected to do so nonetheless.

Finally, plaintiff's assertion that Angelova's decision to obtain a passport for her son was made to pressure plaintiff into settling is contradicted by the facts alleged in the Complaint. First, the Complaint does not allege that Angelova informed plaintiff that she had applied for a passport. Rather, the Complaint alleges that plaintiff was alerted to the application by a telephone call that he received from the United States Department of State in April 2013. Complaint, ¶ 101. By that date, Justice Greco had already issued orders deciding all of the issues in the litigation, and directing the parties to settle a judgment. On March 25, 2013, Devack complied with Justice Greco's directive by serving both plaintiff and the judge with a proposed judgment. Plaintiff misconstrued that submission, believing that it was a "Notice of Settlement" and reasoning that the passport application was designed to give Angelova more leverage in settlement negotiations. Complaint, ¶ 107. In fact, the time for negotiating a settlement was long over.

In sum, none of the acts which plaintiff alleges to be extortionate are remotely criminal. Nothing herein precludes plaintiff from attempting to convince the United States Attorney to the contrary. However, this Court suggests to plaintiff that his time might be better spent promptly seeking leave to appeal the judgment which Justice Greco entered on April 1, 2014.

## CONCLUSION

For the reasons set forth above, this action is summarily dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B). To the extent that they are not moot, plaintiff's claims for injunctive relief are barred by the *Rooker-Feldman* doctrine. Plaintiff's claims for "damages," which are essentially attempts to reverse all child support decisions adverse to plaintiff, are barred both by the domestic relations exception to federal jurisdiction and by *Rooker-Feldman*. In addition, the three causes of action set forth in plaintiff's Complaint fail to state a claim on which relief may be granted.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith and therefore *in forma pauperis* status is denied for purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

**SO ORDERED.**

/s/(SLT)

/SANDRA L. TOWNES
United States District Judge

Dated: May 22, 2014
Brooklyn, New York